**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DARCY WHITE,                              ) | |
|                                           ) | |
|         Plaintiff,                        ) | |
|                                           ) | |
|         v.                                ) | Civil Action No. 12-cv-581 (TSC) |
|                                           ) | |
| BANK OF AMERICA, N.A.,                     ) | |
|                                           ) | |
|         Defendant.                        ) | |
|                                           ) | |

**MEMORANDUM OPINION**

In her suit against Defendant Bank of America, N.A. ("Defendant" or "Bank of
America"), Plaintiff Darcy White alleges violation of (i) Title III of the Americans with
Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"); (ii) § 504 of the Rehabilitation Act,
29 U.S.C. §§ 701 *et seq.* ("§ 504"); and (iii) the District of Columbia Human Rights Act,
D.C. Code §§ 2-1401.01 *et seq.* (the "DCHRA").

Upon consideration of the parties' cross-motions for summary judgment and briefs in
support thereof and in opposition thereto, and for the reasons set forth below, Plaintiff's motion
is hereby **DENIED**, and Defendant's motion is hereby **GRANTED** as to (i) Plaintiff's claims
relating to Defendant's call center policy and now-defunct overnight delivery policy;
(ii) Plaintiff's claims under Title III of the ADA, § 504 and the DCHRA for injunctive relief
from Defendant's Fraud Department guideline; and (iii) Plaintiff's remaining claim for
compensatory damages under § 504.

Both parties' motions for summary judgment as to Plaintiff's remaining claim for
compensatory damages under the DCHRA are hereby **DENIED**.  The court will retain

supplemental jurisdiction over Plaintiff's DCHRA claim for compensatory damages, but will order a new round of summary judgment briefing limited solely to that claim.

## I.      FACTUAL BACKGROUND

### a.   Plaintiff's Interactions With Bank Of America

As an initial matter, Defendant acknowledges that Plaintiff, who is deaf and who lives in Washington, D.C., suffers from a disability.  (*See*, *e.g.*, Def.'s Mot. at 7 n.1).  Defendant also acknowledges that its bank branches are places of public accommodation under both the ADA and the DCHRA.  (*See*, *e.g.*, *id.*).

On September 28, 2011, while she was at a coffee shop, Plaintiff's wallet was stolen. (Compl. ¶ 17; Pl.'s Mot. Ex. 1 at 22:12-22).  The wallet contained Plaintiff's Bank of America credit card, and may have also contained a blank check from her Bank of America checking account.  (Pl.'s Mot. Ex. 1 at 24:12-14, 29:16-21; Pl.'s Mot. Ex 4).  Plaintiff reported the theft to the police, and one of her friends called Defendant on her behalf to request that a hold be put on the credit card.  (Pl.'s Mot. Ex. 1 at 24:23-25:7; Pl.'s Mot. Ex. 4).  Plaintiff did not have any problems conducting the call through her friend, and a hold was successfully placed on her account.  (Pl.'s Mot. Ex. 1 at 25:8-10, 28:15-17).  During the call, Plaintiff learned that her credit card had already been used to make $60 worth of fraudulent charges, and was advised that she should visit a local Bank of America branch "to handle the next steps."  (*Id.* at 25:14-19, 28:1-8).

The next day, Plaintiff went to her local branch, where she opened a new checking account into which she transferred the funds from her old, potentially compromised checking account.  (*Id.* at 29:1-31:13).  Plaintiff did not close her old checking account because she was expecting a direct deposit the next day which could not be redirected to her new checking account in time.  (*Id.* at 30:17-31:20).  Accordingly, Plaintiff was given the number for Defendant's Check and Digital Fraud Claims Department (the "Fraud Department") (*id.*), which

"handles customer accounts with reported fraudulent activity."  (Def.'s Mot. Ex. 10 ¶ 4).

Plaintiff was directed to call the Fraud Department after the direct deposit came through in order

to get those funds transferred into her new checking account.  (Pl.'s Mot. Ex. 1 at 30:17-31:20).

The following day, after the direct deposit had cleared, Plaintiff called Defendant's Fraud

Department to transfer the newly-deposited funds out of her old checking account and into her

new checking account, and to close her old checking account, as she had been directed to do.

(*Id.* at 33:2-12, 34:17-22).  Plaintiff used what is referred to as a "relay service" to make the call.

(*Id.* at 33:2-10).

Individuals who are hearing-impaired can make phone calls in a number of different

ways.  Traditionally, they employed devices called "text telephones" ("TTYs"), which Plaintiff

now considers "outdated."  (Compl. ¶¶ 30-31).  More common today are "relay services," which

insert a third party into the phone call for the purpose of relaying messages back and forth

between the hearing-impaired caller and their hearing counterpart.  IP relay services, for

example, allow anyone with an internet connection to type messages to a "communications

assistant" using a chat-like window in their browser.  The communications assistant then orally

relays those typed messages to the hearing person on the other end of the phone call, and types

back to the hearing-impaired person whatever the hearing person says in reply.

Plaintiff prefers to use a relay service called Purple, which specializes in video relay.

(*See* Pl.'s Mot. Ex. 1 at 33:6-10).  Video relay "works much like a video call that any caller

might make using a digital platform such as Skype or Apple FaceTime":

> The video call is placed to an American Sign Language interpreter, employed by
> the [video relay service] provider, who then makes a standard voice call to the
> video caller's hearing recipient.  The interpreter signs with the caller via the visual
> connection and speaks with the recipient via the voice connection, translating
> messages back and forth.

*Sorenson Commc'ns, Inc. v. FCC*, 765 F.3d 37, 40 (D.C. Cir. 2014).

Plaintiff's video relay call through Purple on September 30, 2011 was initially accepted by the Fraud Department.  (Pl.'s Mot. Ex. 1 at 35:9-11).  She was asked a number of security questions, all of which she answered correctly, and was then transferred to someone else who asked her the same security questions, which she again answered correctly.  (*Id.* at 35:12-21, 37:1-18).  Plaintiff was then told that the Fraud Department could not accept third-party calls, and that, "for security reasons," she would have to either call back using a TTY or go to her local Bank of America branch to conduct her business.  (*Id.* at 37:18-38:3, 39:9-25).  Unfortunately, Plaintiff's TTY was not working at the time, so later that same day, Plaintiff took time off from work to go to her local Bank of America branch, where she was able to get the funds transferred to her new account and close her old account.  (*Id.* at 41:1-42:6, 44:1-4; Pl.'s Reply at 8).

Since September 30, 2011, Plaintiff has continued to bank with Defendant, but she has not tried to contact the bank again via phone, opting instead to visit its branches in person.  (Pl.'s Mot. Ex. 1 at 45:23-46:7).  Plaintiff admits that she suffered no monetary damages as a result of this incident, and states only the following as to her damages:  "It was humiliating and embarrassing, it was discriminatory and caused a lot of stress, and I had to take time off of work, which hearing people wouldn't have to do, so that I could conduct my business with the bank." (*Id.* at 46:8-24).

 b.  The Bank Of America Policies Challenged By Plaintiff

Discovery revealed that in September 2011, Bank of America's Fraud Department had a guideline prohibiting its associates "from conducting banking transactions by telephone calls made through third-party vendors, such as a relay service, for security reasons," given that "highly sensitive and private information related to the [bank's] customers are exchanged" through a third-party during such calls.  (Def.'s Mot. Ex. 10 ¶¶ 5-6).  Specifically, the Fraud Department guideline stated:  "Do not accept calls from 3rd party TDD (Telecommunications

Device for the Deaf) vendors." (Def.'s Mot. Ex. 5). The guideline did, however, enable

associates in the Fraud Department "to conduct all banking transactions" if a customer called via

TTY because, "[w]hen a customer calls through the Bank's TTY line, a third-party is not present,

and only the Bank associate and the customer have access to the customer's private information

during the telephone call." (Def.'s Mot. Ex. 10 ¶¶ 7-8; *see also* Def.'s Mot. Ex. 5).

   Discovery also revealed that in February 2012, about two months before Plaintiff filed

her lawsuit, the Fraud Department guideline was replaced by a new guideline which allows

associates in the Fraud Department to "conduct all banking transactions by telephone if a

customer calls using a third-party vendor, such as a relay service." (Def.'s Mot. Ex. 10 ¶¶ 9, 11).

Specifically, the new guideline states that "[a]ssociates MUST accept calls from Telephone,

Internet and Video Relay Service associates/providers." (Def.'s Mot. Ex. 6) (capitalization in

original). Accordingly, if Plaintiff used a third-party relay service today to conduct the same

transaction that she was unable to complete on September 30, 2011, she would be able to do so.

(Def.'s Mot. Ex. 4 at 41:10-21).

   Discovery also revealed two other ways in which Defendant has treated calls made using

third-party relay services differently than other calls.

   First, employees at Bank of America branches are required to transfer all third-party relay

calls to a call center and cannot take those calls themselves, while they are given the freedom to

decide to either handle non-third-party relay calls themselves or transfer such calls to a call

center. (Pl.'s Mot. Ex. 6 at 18:4-20:19; Pl.'s Mot. Ex. 7 at 17:2-19:9; Def.'s Opp'n Ex. 1 at

29:7-21, 31:4-32:19). Plaintiff frames this policy as potentially disadvantageous to Defendant's

hearing-impaired customers who may want to speak on the phone with an employee of their

local Bank of America branch with whom they have a relationship. (Pl.'s Mot. at 5-6).

Second, it used to be the case that Bank of America customers who did not use third-party relay services could get checks and debit cards overnighted to them, whereas customers who used third-party relay services could not, and had to settle for "standard delivery options." (Pl.'s Mot. Ex. 6 at 25:3-22; Pl.'s Mot. Ex. 8).  Like the Fraud Department guideline, however, the overnight delivery policy is no longer in place, and any hearing-impaired individual who calls Defendant today to place an order for checks or a debit card can have them delivered via overnight delivery.  (Def.'s Opp'n at 15).

Notably, while Plaintiff addresses the call center policy and the overnight delivery policy in her motion for summary judgment, she did not amend her Complaint to add any claims relating to them.  Also notable is the fact that there is no evidence to indicate that Plaintiff (i) has ever called her local Bank of America branch via a third-party relay service and been transferred to a call center; (ii) has ever called Defendant via a third-party relay service to have checks or a debit card overnighted to her; or (iii) that her knowledge of the call center policy or overnight delivery policy in any way deterred her from calling her local Bank of America branch via a third-party relay service or calling Defendant via a third-party relay service in order to have checks or a debit card overnighted to her.

## II.   LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir.

2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987) (citing *Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.").  The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant is "required to provide evidence that would permit a reasonable jury to find" in his or her favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

**III.    ANALYSIS**

a.  Plaintiff Lacks Standing To Challenge The Call Center Or Overnight Delivery Policies

As an initial matter, the court finds that Plaintiff lacks standing to challenge either the call center policy or the overnight delivery policy because she does not meet the modified ADA injury-in-fact requirement.

Disabled individuals need not claim that they would return to a place with known accessibility barriers in order to establish that they are likely to experience a future violation of their rights.  The ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization . . . does not intend to comply with its provisions."  42 U.S.C. § 12188(a)(1).  Instead, as Plaintiff correctly points out, in order to have standing to sue under Title III of the ADA, a plaintiff must simply allege that he or she has "become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation."  *Equal Rights Ctr. v. Hilton Hotels Corp.*, No. 07-cv-1528 (JR), 2009 WL 6067336, at *3 (D.D.C. Mar. 25, 2009) (quotation and citation omitted).

Here, however, Plaintiff does not allege that she became aware of the call center policy or overnight delivery policy and was thereby deterred from either calling her local Bank of America branch via a third-party relay service or calling Defendant via a third-party relay service to order checks or a debit card via overnight delivery.  Nor does Plaintiff allege that her knowledge of these two specific policies deterred her from patronizing Defendant more generally.  Indeed, the Complaint does not say anything at all about the call center policy or the overnight delivery policy, both of which Plaintiff only learned about in discovery, and Plaintiff never amended her Complaint to add any allegations related to these two policies.

Moreover, there is simply no evidence in the record indicating that Plaintiff's knowledge of the call center policy or overnight delivery policy in any way deterred her from calling her local Bank of America branch via a third-party relay service, calling Defendant via a third-party relay service in order to have checks or a debit card overnighted to her or otherwise patronizing Defendant in any way.  While Plaintiff testified at her deposition that she was deterred from calling Defendant using third-party relay services, the context of her deposition testimony makes clear that any such deterrence was based solely on her knowledge of the Fraud Department guideline, which she gleaned from her September 30, 2011 phone call, not the call center policy and overnight delivery policy that she learned about in discovery.  (*See* Pl.'s Mot. Ex. 1 at 45:16-46:7).  Indeed, there is no evidence in the record indicating that Plaintiff has ever called or intended to call her local Bank of America branch via a third-party relay service, or that she has ever called or intended to call Defendant via a third-party relay service to have checks or a debit card overnighted to her.

Because there is neither any allegation nor any evidence suggesting that Plaintiff was deterred by the call center policy or overnight delivery policy from calling her local Bank of America branch via a third-party relay service or calling Defendant via a third-party relay service in order to have checks or a debit card overnighted to her, Plaintiff does not meet the modified ADA injury-in-fact requirement with regard to these two policies.  *See Equal Rights Ctr.*, 2009 WL 6067336, at *3.  Simply put, Plaintiff's allegation that the Fraud Department guideline deterred her from calling Defendant does not give her standing to pursue claims relating to completely distinct policies without alleging or pointing to any evidence that those other policies actually deterred her from doing anything.  Accordingly, to the extent that their respective motions for summary judgment concern the call center policy or overnight delivery policy, Plaintiff's motion is hereby **DENIED** and Defendant's motion is hereby **GRANTED**.

9

b.   Plaintiff's Claims For Injunctive Relief From The Fraud Department Guideline Are Moot

"Simply stated, a case is moot when the issues presented are no longer live or the parties

lack a legally cognizable interest in the outcome."  *Cty. of Los Angeles v. Davis*, 440 U.S. 625,

631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)) (internal quotation marks

omitted).  "Federal courts lack jurisdiction to decide moot cases because their constitutional

authority extends only to actual cases or controversies."  *Iron Arrow Honor Soc'y v. Heckler*,

464 U.S. 67, 70 (1983) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)).  Moreover,

"[i]n actions for injunctive relief, harm in the past . . . is not enough to establish a present

controversy, or in terms of standing, an injury in fact."  *Am. Soc'y for Prevention of Cruelty to

Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 336 (D.C. Cir. 2003); *see

also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not

in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by

any continuing, present adverse effects.").

The court relies on the D.C. Circuit's decision in *Larsen v. U.S. Navy*, 525 F.3d 1 (D.C.

Cir. 2008) in finding that Plaintiff's claims for injunctive relief from the Fraud Department

guideline under Title III of the ADA, § 504 and the DCHRA are all moot.  The plaintiffs in

*Larsen* challenged an allegedly discriminatory policy that was no longer in effect, just as

Plaintiff does here.  The D.C. Circuit rejected the very arguments that Plaintiff makes here in

finding that the *Larsen* plaintiffs' claims were moot.

First, the D.C. Circuit noted, as Plaintiff does here, that "a defendant's voluntary

cessation of a challenged practice moots a case only if the defendant shows that: (1) there is no

reasonable expectation that the alleged violation will recur, and (2) interim relief or events have

completely and irrevocably eradicated the effects of the alleged violation."  *Larsen*, 525 F.3d at 4

(quotations and citations omitted).  The *Larsen* plaintiffs argued, just as Plaintiff does here, that

10

the first condition was not met because the defendant "failed to prove that it wouldn't reinstitute" the challenged policy, but the Court rejected that argument, holding that "because plaintiffs never allege that the [defendant] is likely to or even considering reinstituting the [challenged policy], there is no reasonable expectation that the alleged violation will recur." *Id.* (quotation and citation omitted). The same is true here, as Plaintiff never alleges in her Complaint or in any of her briefs that there is a reasonable expectation that Defendant will reinstitute the former Fraud Department guideline.

The plaintiffs in *Larsen* also pointed out, as Plaintiff does here, that the defendant there "still ha[d] authority to reinstitute the policy," but the D.C. Circuit held that "the mere power to reenact a challenged [policy] is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged [policy] likely will be reenacted." *Id.* (alteration in original) (quotation and citation omitted). The Court found that the record in *Larsen* contained no such evidence. *See id.* Here, too, the record contains no evidence from which this court could conclude that there is a reasonable expectation that the Fraud Department guideline will be reinstituted. Indeed, the court notes that the guideline was eliminated approximately two months ***before*** Plaintiff filed suit in this case. Accordingly, there is no basis for the court to infer that the Fraud Department guideline was eliminated as a result of this litigation and will be reinstituted after this litigation concludes.

*Larsen* also acknowledged that "a case is not moot if a court can provide an effective remedy," but found that because the defendant had already eliminated the challenged policy, and because the plaintiffs never alleged that the defendant would reinstitute it, "any injunction or order declaring [the policy] illegal would accomplish nothing – amounting to exactly the type of advisory opinion Article III prohibits." *Id.* (citation omitted). The same is true here – enjoining

or issuing any declaratory judgment related to the already eliminated Fraud Department guideline in the absence of any allegation or evidence indicating that the guideline will ever be reintroduced would be meaningless, and would constitute an advisory opinion prohibited by Article III.

The court therefore concludes that all of Plaintiff's claims for injunctive relief are moot. Accordingly, Plaintiff's motion for summary judgment is hereby **DENIED**, and Defendant's motion for summary judgment is hereby **GRANTED**, insofar as those motions relate to (i) Plaintiff's entire ADA claim, given that the only remedy available for private enforcement actions under Title III of the ADA is injunctive relief; (ii) Plaintiff's claim for injunctive relief under § 504; and (iii) Plaintiff's claim for injunctive relief under the DCHRA.

    c.  Bank Of America Is Not Subject To Suit Under § 504 of the Rehabilitation Act
          Because It Does Not Receive Federal Financial Assistance

Plaintiff's claim for compensatory damages under § 504 of the Rehabilitation Act hinges on the question of whether Defendant receives "Federal financial assistance" through certain federal loan guaranty and insurance programs.  Having reviewed the cases upon which both sides rely, the court finds that Defendant is not subject to suit under § 504 because it does not receive "Federal financial assistance" through the loan guaranty and insurance programs identified by Plaintiff – namely, the Small Business Administration's guaranteed loan program, the Federal Housing Administration's government-insured mortgage loan program, and the Department of Veterans Affairs' government-issued mortgage loan program.  (*See* Pl.'s Mot. at 13-14; Def's Opp'n at 14-15).

After careful review of the parties' arguments on this question, the court respectfully disagrees with the majority opinion in *Moore v. Sun Bank of N. Fla., N.A.*, 923 F.2d 1423 (11th Cir. 1991), and agrees with the dissent in *Moore*, the Sixth Circuit's unanimous opinion in

*Gallagher v. Croghan Colonial Bank*, 89 F.3d 275 (6th Cir. 1996), and the district court opinion

and magistrate judge's Memorandum and Recommendation in *McCullough v. Branch Banking &*

*Trust Co., Inc.*, 844 F. Supp. 258 (E.D.N.C. 1993), *aff'd*, 35 F.3d 127 (4th Cir. 1994).  *Moore*

and *McCullough* both concerned the question of whether a bank's participation in the Small

Business Administration's guaranteed loan program constitutes the receipt of "Federal financial

assistance," thereby rendering it amenable to suit under § 504, and *Gallagher* concerned the

same question with regard to student loans that are subsidized and guaranteed with federal funds.

  First, the court finds that congressional intent is not clearly and unambiguously expressed

with regard to the question of whether § 504's reference to "Federal financial assistance"

excludes contracts of guaranty and insurance.  While § 504 does not explicitly exclude contracts

of guaranty and insurance from the definition of "Federal financial assistance," the Supreme

Court stated in *dicta* in *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606-

07 (1986), that the operative inquiry is whether that entity is the "intended recipient" of the

benefits of such assistance.[1]  The court agrees with the Sixth Circuit's holding in *Gallagher* that

the governmental intent animating the loan guaranty and insurance programs at issue here is to

assist the parties who ultimately take out the guaranteed and insured loans, not the banks and

other institutions that extend such loans, even though those institutions derive an economic

---

[1] *See also* James Lockhart, Annotation, *What Constitutes Federal Financial Assistance for Purposes of § 504 of Rehabilitation Act (29 U.S.C.A. § 794), Which Prohibits Any Program or Activity Receiving Federal Financial Assistance from Discriminating on Basis of Disability*, 147 A.L.R. Fed. 205 §§ 3, 4[b] (1998) (noting that courts have recognized that the proper test for distinguishing "Federal financial assistance" from other payments or transfers is "whether the defendant has received a subsidy or gift, or, in other words, a payment or transfer for less than fair market value," and that one test for determining whether a payment incorporates a subsidy is the "governmental intent test," which asks "whether Congress or the federal agency administering a program intended to subsidize the entity, and [holds] that absent such an intent, the mere fact that the entity has received the benefit of a below-market-value transfer or transaction will not cause the transfer or transaction to be considered federal financial assistance").

benefit from these programs.  *See Gallagher*, 89 F.3d at 278 ("[T]he coverage of the

Rehabilitation Act does not follow federal aid past the intended recipient to those who merely

derive a benefit from the aid or receive compensation for services rendered pursuant to a

contractual arrangement.") (quotation and citation omitted).  In the court's view, this so-called

"governmental intent" test introduces ambiguity into § 504.

Having found § 504 to be ambiguous, the question for the court therefore becomes

whether § 504's implementing regulations are "based on a permissible construction of the

statute."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  The

court finds that § 504's implementing regulations – which expressly exclude contracts of

guaranty and insurance from the definition of "Federal financial assistance" – are, in fact, based

on a permissible construction of the statute.  *See* 28 C.F.R. § 41.3(e) ("Federal financial

assistance means any grant, loan, contract *(other than a procurement contract or a contract of*

*insurance or guaranty)*, or any other arrangement by which the agency provides or otherwise

makes available assistance") (emphasis added).

In so finding, the court notes the 1978 amendments to the Rehabilitation Act, which made

the remedies, procedures and rights set forth in Title VI of the Civil Rights Act of 1964 available

to litigants suing under the Rehabilitation Act.  Title VI explicitly excludes contracts of guaranty

and insurance from the definition of "Federal financial assistance."  The court also notes Senate

Report No. 95-890, from May 15, 1978, which states:

> Subsection (a)(2) of the new section makes available the remedies, procedures,
> and rights set forth in Title VI of the Civil Rights Act of 1964 to any person
> aggrieved by any act or failure to act by any recipient of Federal assistance or any
> Federal provider of Federal assistance under Section 504 of the Rehabilitation Act
> of 1973.
>
> It is the committee's understanding that the regulations promulgated by the
> Department of Health, Education and Welfare with respect to procedures,
> remedies, and rights under Section 504 conform with those promulgated under

Title VI.  Thus, this amendment codifies existing practice as a specific statutory requirement.

S. Rep. No. 95-890 (1978).  Lastly, the court notes that its finding that the implementing regulations represent a permissible construction of § 504 is in keeping with the governmental intent test discussed above and in *Gallagher – i.e.*, that while Defendant receives a financial benefit as a result of the loan guaranty and insurance programs cited by Plaintiff, the intended beneficiaries of those programs are the parties who actually take out loans from Defendant pursuant to them, not Defendant itself.

For all of the foregoing reasons, the court will defer to § 504's implementing regulations. In so deferring, the court finds that contracts of guaranty and insurance are, in fact, excluded from the definition of "Federal financial assistance" in § 504, and that Defendant therefore cannot be sued under § 504 on the basis of its participation in the loan guarantee and insurance programs cited by Plaintiff.  Accordingly, Plaintiff's motion for summary judgment is hereby **DENIED**, and Defendant's motion for summary judgment is hereby **GRANTED**, insofar as those motions concern Plaintiff's claim for compensatory damages under § 504.

d.   Plaintiff's Remaining DCHRA Claim For Compensatory Damages

Having denied summary judgment to Plaintiff and granted summary judgment to Defendant on all of Plaintiff's federal law claims as well as her claim for injunctive relief under the DCHRA, the only claim that remains in this case is Plaintiff's claim for compensatory damages under the DCHRA, which is a pendent claim under District of Columbia law.

Whether to retain jurisdiction over pendent state and common law claims after the dismissal of the federal claims is "a matter left to the sound discretion of the district court." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265-66 (D.C. Cir. 1995).  "[P]endent jurisdiction is a doctrine of discretion, not a plaintiff's right." *United Mine*

*Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Under 28 U.S.C. § 1367(c)(3), a district

court may choose to retain jurisdiction over, or dismiss, pendent state law claims after federal

claims are dismissed. "[I]n the usual case in which all federal-law claims are eliminated before

trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial

economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction

over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7

(1988).

The court finds, however, that given how long this litigation has been pending in federal

court, this is not such a "usual case." *Id.* Accordingly, the court will exercise supplemental

jurisdiction over Plaintiff's remaining DCHRA claim for compensatory damages. The court

will, however, **DENY** both parties' motions for summary judgment as to Plaintiff's DCHRA

claim for compensatory damages, and will order a new round of summary judgment briefing

limited solely to that claim. The parties are hereby **ORDERED** to file with the court a proposed

schedule for briefing this remaining issue by no later than September 2, 2016.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion is hereby **DENIED** and Defendant's motion

is hereby **GRANTED** as to (i) Plaintiff's claims relating to the call center policy and the

overnight delivery policy; (ii) Plaintiff's claims under Title III of the ADA and the DCHRA for

injunctive relief from the Fraud Department guideline; and (iii) Plaintiff's claims under § 504.

As to Plaintiff's remaining claim for compensatory damages under the DCHRA, both

parties' motions for summary judgment are hereby **DENIED.** While the court will retain

supplemental jurisdiction over Plaintiff's DCHRA claim for compensatory damages, the parties

are hereby **ORDERED** to file a new round of summary judgment briefing limited solely to that

claim.  The parties are hereby further **ORDERED** to file with the court a proposed schedule for briefing this remaining issue by no later than September 2, 2016.

Date:  August 2, 2016

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge